UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| BRIAN BATTLES           ) | |
|     Plaintiff           ) | |
| V.                      ) | TRIAL BY JURY DEMANDED |
|                         ) | |
| PAUL MILLER NISSAN, LLC and WELLS   ) | |
| FARGO BANK, N.A. d/b/a WELLS FARGO  ) | |
| DEALER SERVICES, INC.   ) | COMPLAINT |
|     Defendants          ) | |
|                         ) | APRIL 16, 2012 |

## COMPLAINT

1.  This is a suit brought by a Connecticut consumer arising from the purchase of a motor vehicle.  Plaintiff brings this action to recover actual, statutory, and punitive damages, reasonable attorney's fees, and costs from the defendant Paul Miller Nissan, LLC ("PMN") for engaging in illegal, unfair and deceptive actions.  Plaintiff claims that PMN violated the Truth in Lending Act, 15 U.S.C. §§ 1601 *et seq.* ("TILA"), the Equal Credit Opportunity Act, 15 U.S.C. §§ 1691 et seq. ("ECOA), the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. §§ 42-110a *et seq.* ("CUTPA"), the Connecticut Retail Installment Sales Finance Act, Conn. Gen. Stat. §§ 36a-770 *et seq.* ("RISFA"), and that PMN committed fraud, negligent misrepresentation, fraudulent misrepresentation, and is liable for breach of contract.  Defendant Wells Fargo Bank, N.A. d/b/a Wells Fargo Dealer Services, Inc. ("Wells Fargo") is liable for the claims against PMN as the assignee of a retail installment sales contract for the purchase of the vehicle and because it has retained the benefit of that contract notwithstanding its knowledge of PMN's violations of RISFA, and is independently liable under the Fair

Credit Reporting Act, 15 U.S.C. §§ 1681 *et seq.* ("FCRA") for making an inquiry into Plaintiff's credit report without proper authorization.

2. Plaintiff is a consumer and natural person residing in West Hartford, Connecticut.

3. Defendant PMN is a Connecticut corporation that operates an automobile dealership in Fairfield, Connecticut.

4. Defendant Wells Fargo is a bank with headquarters in San Francisco, California, and is registered with the Connecticut Department of Banking.

5. Jurisdiction in this court is proper pursuant to 15 U.S.C. § 1640(e), 15 U.S.C. § 1691e(c) and 28 U.S.C. § 1331.  Supplemental jurisdiction exists for the state law claims pursuant to 28 U.S.C. § 1367.

6. This court has jurisdiction over the defendants because they are either located in Connecticut, regularly conduct business in Connecticut, or both.

7. Venue in this court is proper, because the plaintiff resides in Connecticut, and the claims involve a transaction that occurred in Connecticut.

8. On or around late May 2011, Plaintiff was looking to purchase an automobile, and, after seeing an advertisement boasting financing approvals, Plaintiff visited PMN's dealership.

9. Plaintiff spoke with Juan Mills ("Mills"), a salesman at PMN, and told him that he had $2,000 available for down payment as well as a 2007 Dodge Nitro to trade in.

10. Mills showed Plaintiff a 2011 Nissan Rouge ("the Vehicle") and Plaintiff decided to purchase it.

11. After completing a finance application, Mills told Plaintiff that his credit score was relatively low, and suggested that Plaintiff put down an additional $1,000 dollars on the vehicle, for a down payment totaling $3,000.

12. Plaintiff responded that he could not afford the $3,000 cash down payment, but that he would be able to pay $2,500. Mills agreed to the $2,500 down payment and submitted the financing paperwork for approval.

13. On or around May 31, 2011, Plaintiff completed a Retail Installment Sales Contract ("RISC"). The RISC provided that the cash down payment was $2,500, that the total sale price of the vehicle was 54,788.56, that the monthly payment would be $726.23 and that the contract was assigned to Americredit.

14. On or around June 3, 2011, Mills contacted Plaintiff and told him that the financing had been approved and that he could pick up the vehicle.

15. That same day, Plaintiff went to the dealership to pick up the car and traded in his 2007 Dodge Nitro ("the Trade-In").

16. Plaintiff indicated that he wanted to transfer his old license plates to the new vehicle, but was told that this was not possible because the dealer was waiting on something from the bank.

17. At this time, Plaintiff was given dealer plates for the Vehicle, and was told that everything would be completed in a few days, at which time Plaintiff would be able to put his own plates on the vehicle.

18. Accordingly, Plaintiff took delivery of the Vehicle on June 3, 2011.

19. After a few weeks had passed, Plaintiff had still not heard from PMN regarding his license plates. Plaintiff called the dealership and requested to speak with

someone regarding his car. Plaintiff was told that Mac Tavadros ("Tavadros"), the dealership's finance manager, would return his call.

20. Plaintiff made several follow up calls to PMN, but was unable to obtain any information.

21. A few weeks later, Tavadros contacted Plaintiff via telephone and requested that Plaintiff return to PMN and, on or around June 20, 2011, Plaintiff returned to PMN.

22. Tavadros told Plaintiff that the bank had only approved Plaintiff to finance $30,000 dollars and requested an additional down payment from Plaintiff to make up for the difference between the financing and the purchase price.

23. Plaintiff would not have agreed to this arrangement had PMN requested such a large down payment at the beginning of the transaction, and Plaintiff asserted rescission prior to the making of the Second Retail Installment Contract, and attempted to restore Paul Miller Nissan as nearly as possible to its position prior to the First Retail Installment Contract.

24. When Plaintiff inquired as to whether he would be able to get his car back if he could not come up with the additional down payment, Tavadros responded that the Trade-in had already gone to auction.

25. Because Plaintiff believed that he could not get the Trade-in back, and because he had been driving the Vehicle for a month and had put nearly 6,000 miles on it, Plaintiff reluctantly agreed to put down an additional $1,200 as a down payment and agreed to pay an additional $350 per month for 10 months to make up the difference between the approved financing and the purchase price.

26. In connection with the transaction, Plaintiff also purchased a vehicle service contract ("the Service Contract") for $2,177.24. Plaintiff agreed to pay for the Service contract in four installments.

27. PMN prepared a second Retail Installment Sales Contract ("Second RISC"). The Second RISC provided that Plaintiff's total down payment was $6,916.61, and that the total sale price of the Vehicle was $50,837.33, that the monthly payment would be 610.01.

28. Although the down payment was listed as $6,916.61, Plaintiff had only paid $3,700.

29. Plaintiff's monthly installment payments for the remainder of the down payment were not included in the payment schedule on the Second RISC.

30. The price of the Service Contract and the installment payments were not included in the payment schedule on the Second RISC.

31. PMN did not send notice that it had withdrawn the credit that it had previously extended under the First RISC, or, alternatively, that it had denied plaintiff's credit application within thirty days of plaintiff's submission of his completed credit application, as required by ECOA.

32. Presumably, as a result of PMN's difficulty in assigning the First RISC to a financial entity as it had originally planned, PMN solicited other credit entities to make inquiries into plaintiff's credit reports without plaintiff's permission and despite the fact that, at the time those inquires were made, plaintiff was not seeking an additional extension of credit and had no desire to obtain credit.

33.     By its actions as described above, PMN willfully violated TILA, RISFA, ECOA and CUTPA, and it has committed fraud, fraudulent misrepresentation, and negligent misrepresentation and breach of contract.

34.     Prior written notice of Plaintiff's claims was given to PMN and Wells Fargo, and, notwithstanding Wells Fargo's knowledge of PMN's violations of RISFA, Wells Fargo continued to retain the benefit of the contract.  As such, Wells Fargo is not entitled to recovery of finance, delinquency or collection charges pursuant to Conn. Gen. Stat. § 36a-786.

35.     Wells Fargo violated FCRA § 1681b(f) in that it inquired into plaintiff's consumer reports without proper authorization.

**Wherefore, Plaintiff claims** Actual damages and common law punitive damages for the fraud claim, actual damages pursuant to the misrepresentation claims, statutory damages of $2,000 plus a reasonable attorney's fee; actual money damages pursuant to 15 U.S.C. §1691e(a), punitive damages of $10,000 pursuant to 15 U.S.C. §1691e(b), and attorney's fees and costs of this action pursuant to 15 U.S.C. §1691e(d); statutory punitive damages pursuant to C.G.S. § 42-110g(a); attorney's fees pursuant to C.G.S. § 42-110g(d); an order declaring that Wells Fargo is not entitled to finance, delinquency or collection charges pursuant to C.G.S § 36a-786; an order from the Court ordering the PMN to cease and desist from engaging in unfair and deceptive trade practices; plaintiff also claims a reasonable attorney's fee, plaintiff seeks recovery of monetary damages; statutory damages pursuant to 15 U.S.C. § 1681n; punitive damages pursuant to 15 U.S.C. § 1681n; costs and attorney's fees pursuant to 15 U.S.C. § 1681n; damages, costs and attorney's fees pursuant to 15 U.S.C. § 1681*o*; and such other further relief to which Plaintiff is, at law, or in equity and by statute, entitled to against the PMN and Wells Fargo.

**PLAINTIFF, BRIAN BATTLES**

By: /s/Daniel S. Blinn
   Daniel S. Blinn, ct02188
   Consumer Law Group, LLC
   35 Cold Spring Rd. Suite 512
   Rocky Hill, CT  06067
   Tel. (860) 571-0408
   Fax. (860) 571-7457
    dblinn@consumerlawgroup.com